Opinion issued June 25, 2009









Opinion issued June 25,
2009                                                                        

 

 

 

 

 

 

 



 

 

 

 

 

 

 

In The

Court of Appeals

For The

First District of Texas

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



NO.   01-08-00615-CR

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



JOHN WILSON HERRERA, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 

 



On Appeal from the 184th District Court

Harris County, Texas

Trial Court Cause No. 1102614

 

 



MEMORANDUM OPINION




After a jury found John
Wilson Herrera guilty of the felony offense of aggravated sexual assault of a
child under the age of 14, the trial court sentenced him to 15 years’
imprisonment.  Herrera appeals, contending that he was deprived of
constitutionally effective assistance of counsel at trial because trial counsel
failed to challenge the admission of the testimony of three of the State’s
witnesses.  We conclude that Herrera has failed to make the required showing
that his trial counsel’s representation was deficient and therefore affirm.  

Background

Statement of Facts

Thirteen-year-old S.S.
and his mother traveled from their home in Florida to Houston in the summer of
2003 to visit extended family.  After their arrival, S.S.’s cousin, R.K., who
is close to S.S.’s age, invited S.S. to stay overnight with him at Herrera’s
apartment and then spend the next day at Astroworld.  Herrera is the brother of
R.K.’s stepfather.  Although S.S. had never met Herrera before, R.K. had become
familiar with him after numerous visits and overnights with him. After
receiving permission from his mother, S.S. went with R.K. and Herrera.   

That night, Herrera and
his apartment roommate made alcohol and marijuana available to the boys. 
Although S.S. had no previous experience with either, he tried to keep up with
his cousin, and became ill.  

At Herrera’s suggestion,
S.S. took a shower in the hope that it would help him feel better.  While S.S.
was showering, he saw Herrera enter the bathroom with what appeared to be a
videocamera trained at him.  S.S. yelled at Herrera to leave.  Herrera stated
that he only meant to see if S.S. was all right, and left the bathroom.  

After showering, S.S.
dressed in underwear and gym shorts, went into the bedroom, and lay down next
to his cousin, who was already asleep.  Herrera entered the room and asked if
S.S. wanted a massage, telling S.S. that his cousin liked massages after he had
been drinking because they made him feel better.  Herrera began to massage
S.S.’s back, then flipped S.S. over and removed his clothing.  Herrera then put
his mouth in contact with S.S.’s genitals.  S.S. remained motionless with
fright during this incident.   Afterward, Herrera left the room, but when S.S.
awakened, he found Herrera beside him in the bed, in between S.S. and R.K.  

Embarrassed and ashamed
about the incident, S.S. did not tell anyone about it until several years
later, when he confided in his girlfriend after she revealed to him that she
was a victim of childhood sexual abuse.  S.S.’s girlfriend told her mother
about S.S.’s abuse.  Some time later, S.S.’s mother learned about the incident
in passing during a conversation with the girlfriend’s mother and alerted the
local police in Florida.  Detective C. Dehling interviewed S.S. and then turned
the recording of the interview and the case over to the Houston Police
Department’s Sex Crime Unit.  

Trial Court
Proceedings

The jurors heard
testimony from S.S., R.K., and Herrera.  Each told a different story about the
events of that evening.  Herrera denied that any of the circumstances recounted
by S.S. ever happened—he testified that he did not provide any alcoholic
beverage or drugs, did not enter the bathroom while S.S. was showering, never touched
S.S. inappropriately, and did not sleep in the same bed with R.K. and S.S. 
R.K. testified that he slept through the night the incident occurred, and that
he probably would have awoken if Herrera had engaged in the conduct alleged by
S.S.  The jurors also heard from the police investigators.  Because of the
absence of any physical evidence, the jurors decided the case based solely on
the witnesses’ testimony.

Discussion

To prevail on
a claim of ineffective assistance of counsel, the defendant must show that (1)
his counsel’s performance was deficient and (2) a reasonable probability exists
that the result of the proceeding would have been different.  Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); Thompson v. State,
9 S.W.3d 808, 812 (Tex. Crim. App. 1999).  The first prong of this test requires
the defendant to show that counsel’s performance fell below an objective
standard of reasonableness, in that counsel made such serious errors he was not
functioning effectively as counsel.  Strickland, 466 U.S. at 687, 104 S. Ct. at 2064; Thompson, 9 S.W.3d at 812.  Thus, the defendant must prove
objectively, by a preponderance of the evidence, that his counsel’s
representation fell below professional standards.  Mitchell v. State, 68
S.W.3d 640, 642 (Tex. Crim. App. 2002).  

The second
prong requires the defendant to show a reasonable probability that, but for
counsel’s unprofessional errors, the result of the proceeding would have been
different.  See Strickland, 466 U.S. at 694, 104 S. Ct. at 2068; see also Thompson, 9 S.W.3d at 812.  In reviewing counsel’s
performance, we look to the totality of the representation to determine the
effectiveness of counsel, indulging a strong presumption that the attorney’s
performance falls within the wide range of reasonable professional assistance
or trial strategy.  Thompson, 9 S.W.3d at 813.  

The record
must firmly support a claim of ineffective assistance.  Id. (citing McFarland
v. State, 928 S.W.2d 482, 500 (Tex. Crim. App. 1996)).  The record on
direct appeal is usually not sufficient to show that counsel’s representation
was so deficient and so lacking in tactical or strategic decision making as to
overcome the presumption that counsel’s conduct was reasonable and
professional.  Bone v. State, 77 S.W.3d 828, 833 (Tex. Crim. App.
2002).  

          Herrera contends that trial
counsel was ineffective because he failed to object to certain testimony from
three witnesses: (1) testimony from Dr. Lawrence Thompson, the State’s expert,
that testimony that false allegations of sexual abuse by children are extremely
rare; (2) testimony from Detective C. Dehling, the Florida police officer who
interviewed S.S., that she had no reason to doubt S.S. was telling the truth;
and (3) testimony from Detective M. Gallagher of the Houston Police Department
that she determined S.S.’s report of sexual abuse was credible.  We address
each witness’s testimony in turn.

          Dr. Thompson’s testimony


Herrera contends that
trial counsel rendered ineffective assistance by failing to object to Dr.
Thompson’s testimony as inadmissible under Texas Rule of Evidence 702.  Under
this rule, an expert may not proffer an opinion as to the veracity of a
particular witness, or class of persons to whom the witness belongs.  Yount
v. State, 872 S.W.2d 706, 711 (Tex. Crim. App. 1993).  An opinion about
another’s truthfulness does more than “assist the trier of fact to understand
the evidence or to determine a fact in issue”; it decides an issue for the
jury.  Id. at 709; Blackwell v. State, 193 S.W.3d 1, 21
(Tex. App.—Houston [1st Dist.] 2006, pet. ref’d).  The jury alone is to decide
whether a particular witness’s testimony is credible.  Yount, 872 S.W.2d
at 711.

In its case in chief, the
State called Dr. Thompson, the director of therapy and psychological services
at Harris County Children’s Assessment Center, to provide expert testimony
about “delayed outcry,” the time lapse between when some child victims of
sexual abuse suffer the abuse and when they first disclose the abuse to another
person.  Dr. Thompson explained that in more than 50 percent of child sexual
abuse cases, some delay in disclosure occurs, and that the fact of delay does
not, by itself, raise a question about the child’s credibility.  The State also
elicited testimony from Dr. Thompson describing characteristics of sex
offenders, common characteristics of potential victims of child sexual abuse as
well as possible psychological effects that sexual assault has on children. 

Herrera’s trial counsel
extensively cross-examined Dr. Thompson about the possibility that a child
might make false allegations of sexual abuse:




Q.      As a clinician and in your training you were
taught to look for false allegations; is that correct?

A.      Could you be more specific?  You say I was
taught to look for false allegations?

Q.      You’re
aware that false allegations can occur?

A.      I
am aware that false allegations can occur.

Q.      And, as a clinician, when you interview
somebody, that would be something you would take into account, right?

A.      Yes.

Q.      I mean, you wouldn’t automatically assume just
because the child said—or is sitting in front of you that—I know you wouldn’t
voice this to the child, but you wouldn’t automatically assume this child is
telling the truth without hearing a word the child said, right?

A.      No.  I mean, in fact and in the way of doing
mental health work, psychotherapy, you just try and meet the child where they
are at, wherever they are at. 

Q.      Right.  I mean, because making a false
allegation like this could be a sign of a different mental health issue, right?

A.      Could
be.

Q.      Now, you said delayed outcry occurs in roughly
50 percent of these cases, is that right?

A.      Over 50 percent.  You know, different studies
point to different numbers; but what I can say is generally that number – that
there is a delayed outcry in more than half of all cases.  

Defense counsel pursued some other
lines of inquiry, but returned to the issue of false allegations, asking
Thompson, “Is it possible that in order to try and gain trust or favoritism
with a girlfriend, a 16- or 17-year-old could fabricate or lie about a sexual
assault?” Thompson responded, “No. That’s not anything I ever encountered.” 
Defense counsel continued:

Q. 
    Do you think it’s hypothetically possible?

A.      I think most anything is hypothetically possible,
but that type of fabrication is not something that I have encountered.  And so
it’s possible, but definitely not probable in my clinical experience.

Q.      Well, let me ask you this:  Doctor, if this
hypothetical boy sees the girlfriend getting favorable treatment and being
excused from her grades falling and things like that, do you think that might
lead him to make a false disclosure?

A.      No.  No.  What the literature and what my
experience shows with regard to false disclosure is that . . . there is typically
an element of coaching of a child, but I cannot tell you of one instance where
a child has seen another child getting preferential treatment because they were
sexually abused and then saying, “Let me say I have been sexually abused, too,”
to get the same preferential treatment.  That has not been my experience.

Q.      In a hypothetical situation, what about if
it’s for a sexually active girl, hypothetically, sexually active boy,
hypothetically, trying to gain trust with that girl to say, “I was sexually abused,
also,” to build that bond?  Do you think that could happen?

A.      Again, you know, anything is possible; but in
my clinical experience and my knowledge of the literature, those are not the
triggers for false allegations of abuse that we see.

Q.      But then again, you have not examined [S.S.]
in this case, have you?




On redirect, the State
sought to rehabilitate Dr. Thompson on the issue of false allegations, asking,
“What about when you’re asked about false allegations or false disclosure, is
that more likely to happen or less likely?”  Dr. Thompson responded:

It’s
less likely.  I was able to reference this myself, that I speak of false
allegations of abuse, but false allegations of abuse are very rare.  Kids do
not tend to make up allegations of child sexual abuse.  In my clinical
experience, and the literature supports this, in less than 2 to 3 percent at
most of all cases which there is an allegation of sexual abuse is a child being
coached or making a false allegation of abuse.  It’s statistically a very rare
phenomen[on], but it does—but it can happen.

Herrera contends that Dr.
Thompson improperly offered a direct opinion as to another witness’s veracity. See
Schutz v. State, 957 S.W.2d 52, 59 (Tex. Crim. App. 1997).  In Lane v.
State, our sister court sustained a challenge to Dr. Thompson’s nearly
identical testimony in that case, concluding that, “Dr. Thompson’s testimony
that false accusations of childhood sexual assault are very rare had the effect
of telling the jury they could believe [the complainant’s] testimony, which is
expressly forbidden.”  257 S.W.3d 22, 27 (Tex. App.—Houston [14th Dist.] 2008,
pet. ref’d).  In this case, however, it was not the State, but rather defense
counsel who initiated the questioning about the possibility that a hypothetical
child, meeting S.S.’s description, might make a false allegation of sexual
abuse.  If one party opens the door to an issue, the party’s opponent may fully
explain that issue even if the evidence presented to do so would not ordinarily
be admissible.  Parr v. State, 557 S.W.2d 99, 102 (Tex. Crim. App. 1997);
Fisher v. State, 121 S.W.3d 38, 40–41 (Tex. App.—San Antonio 2003, pet.
ref’d) (holding defense opened the door to questions concerning whether child
was telling the truth). An opposing side has a right to reply and correct a
false impression left with the jury.  Reynolds v. State, 227 S.W.3d 355,
366–67 (Tex. App.—Texarkana 2007, no pet.).  But, the party offering the
evidence may not “stray beyond the scope of the invitation.” Johnson v.
State, 611 S.W.2d 649, 650 (Tex. Crim. App. 1981), quoted in Bush v.
State, 773 S.W.2d 297, 301 (Tex. Crim. App. 1989); see Schutz,
957 S.W.2d at 71.

The record here reveals
Herrera’s trial counsel’s questioning of Dr. Thompson, in which counsel posited
that a hypothetical child, with a description nearly identical to the
complainant’s, fabricated his report of sexual abuse.  This questioning opened
the door to Dr. Thompson’s otherwise objectionable testimony.  See Fisher,
121 S.W.3d at 40.  Because trial counsel’s cross-examination invited the
testimony Herrera complains of here, it would not have been fruitful for
counsel to object to it.[1] 
We therefore hold that trial counsel’s failure to object to Dr. Thompson’s
testimony was not constitutionally deficient.

Detective Dehling’s
testimony

The State of Texas brought Detective Dehling from Florida to testify about her interview of S.S. 
Detective Dehling explained that, at the time of the interview, she worked in
the police department’s sex crimes unit, specializing in child abuse
investigations.  After having her testify about the investigation procedures
and interview techniques she used, the State elicited details from Detective
Dehling concerning the interview:

Q.      Now, what was [S.S.]’s demeanor at the
beginning of the interview?

A.      He was somewhat quiet and reserved, and he
appeared afraid or embarrassed to be very detailed about the incident.

Q.      And
was he able to give you appropriate responses?

A.      Absolutely,
yes.

Q.      . . .  So, would you say that his responses were
detailed or not?

A.      To
the best of his ability to be detailed . . . they were.

* * *

Q.      Now, throughout your interview with [S.S.],
did his demeanor change at all?

A.      To the best of my recollection, when it came
to . . . the actual description of the sexual act, he appeared to be
embarrassed to . . . fully disclose what had occurred.

* * *

Q.      Would you say that [his] responses were
consistent with someone who had been sexually assaulted?

A.      Well, it’s hard to say consistent because
everybody is different; but I can say I had absolutely no reason to doubt the
things he was telling me were true.

          There is a “fine but
essential” line between helpful expert testimony and impermissible comments on
credibility.  Schutz, 957 S.W.2d at 60 (quoting State v. Myers,
382 N.W.2d 91, 98 (Iowa 1986)).   For instance, an expert witness’s testimony
that, in her opinion, the child does not exhibit indications of coaching does
not constitute an opinion on the child’s ultimate truthfulness.  See Reynolds,
227 S.W.3d at 366; see also Schutz, 957 S.W.2d at 73; Burns v. State,
122 S.W.3d 434, 437 (Tex. App—Houston [1st Dist.] 2003, pet. ref’d) (expert’s
testimony regarding psychological test results, which suggested victim answered
questions in open, non-defensive, and truthful manner, did not constitute
impermissible comment on victim’s truthfulness).  

          In contrast, the Texarkana
court of appeals, in Fuller v. State, held that defense counsel was constitutionally
ineffective by not objecting to the State’s question to its child advocacy
center forensic expert, who had interviewed the child complainant, as to
whether, after observing the complainant’s conduct and her description of the
incident at issue, the expert had formed an opinion as to whether the
complainant was being truthful.  224 S.W.3d 823, 835 (Tex. App.—Texarkana 2007,
no pet.).  The expert responded that she “saw nothing in [the complainant’s] demeanor
and nothing in the information that she gave me that indicated that she was not
being truthful with me.”  Id.; see also Miller v. State, 757
S.W.2d 880 (Tex. App.—Dallas 1988, pet. ref’d) (finding trial counsel
ineffective because of failure to object to State’s questions eliciting
forensic interviewer’s opinion on whether child was, in fact, sexually abused
and whether child’s report of sexual abuse was truthful).   

Herrera likens Detective
Dehling’s testimony to the prohibited testimony in Fuller.  The
difference between this case and Fuller, however, lies not with each
witness’s answer, but with the question that elicited it.  Texas courts
consistently have held the failure to object to the repeated elicitation and
offer of this type of testimony to constitute ineffective assistance of counsel
when presented on direct review.  Fuller, 224 S.W.3d at 836 (citing Sessums
v. State, 129 S.W.3d 242, 248 (Tex. App.—Texarkana 2004, pet. ref’d), Miller
v. State, 757 S.W.2d 880, 844 (Tex. App.—Dallas 1988, pet. ref’d), and Garcia
v. State, 712 S.W.2d 249, 253 (Tex. App.—El Paso 1986, pet. ref’d)).  The Fuller
court held that “[t]he State’s elicitation of [the expert]’s testimony
regarding her expertise in determining truthfulness and credibility, and her
particular determination of [the complainant]’s truthfulness, are express
error.”  Id. at 835.

          Here, the State’s question
as to whether S.S.’s responses were consistent with someone who had been
sexually assaulted, sought permissible testimony.  See Cohn v. State, 849 S.W.2d 817, 818–19 (Tex. Crim.
App. 1993) (holding that trial court may admit expert testimony that child exhibits
behavioral characteristics shown to be common among children who have been
abused); Burns, 122 S.W.3d at 437.  Given that the question itself was
not objectionable, and the witness’s response was brief and occurred only in
passing, Herrera’s trial counsel could have reasonably concluded that an
objection would have highlighted the unsolicited testimony to his client’s
detriment.  See Tong v. State, 25 S.W.3d 707, 713–14 (Tex. Crim. App.
2000) (holding that reviewing court must presume that counsel had plausible
reason for his actions). We therefore hold that the trial counsel’s performance
was not constitutionally ineffective because of his failure to object to
Detective Dehling’s testimony.

Detective Gallagher’s
testimony

The State presented
Detective Gallagher to testify concerning her involvement in investigating the
reported abuse.   In its direct examination, the State elicited the following
testimony concerning the investigation procedure:

Q.      Procedurally, once you’re done with your
investigation, what are your options? . . . 

A.      Either present it and proceed on with charges
or inactivate it pending more evidence or someone else to come forward; or
inactivate it because I didn’t feel the complainant was being truthful or so
forth, where I didn’t feel comfortable to go on beyond signing my name to an
affidavit saying that I felt . . . there was enough probable cause there. . . .

Q.      Okay. 
So, in this case you didn’t close it out as inactive.

A.      No, ma’am.  

During cross-examination, Herrera’s
counsel questioned Detective Gallagher on her handling of the investigation. 
When Detective Gallagher indicated that she had spoken again with S.S. after
interviewing S.S.’s girlfriend and other witnesses, counsel asked:  “So,
basically, you confronted him with inconsistencies; and he stayed consistent
with his original interview.  Would that be fair enough?”  Detective Gallagher
responded that it was.  At the end of his cross-examination, counsel pursued
the following line of inquiry:

Q.      When an investigation is, your quote,
complete, and you present it to the D.A., you have the option of not even
taking the case to the district attorney; is that right?

A.      Yes,
sir.

Q.      Okay.  And one of the reasons you gave is
because you didn’t feel like the complainant was being truthful in situations
like that?

A.      In
most circumstances, yes.

Q.      Okay. 
So, you would agree with me there are allegations like this that in your
opinion turn out to be false?

A.      Yes.

The testimony Herrera complains of
occurred during the State’s redirect examination:

Q.      When you interviewed [the other witnesses], or
even the defendant, . . . were there inconsistencies you found that differed
from [S.S.]’s version?

A.      Yes,
ma’am.

Q.      Okay.  So, when you confronted [S.S.] about
the inconsistencies, . . . when he responded to your questions, were his
answers consistent with the audio recorded statement?

A.      Yes.


* * *

Q.      Okay.  So, were you able at some point to make
a determination as to his credibility?

A.      Yes.

Q.      If you hadn’t thought he was credible or truthful,
you would have closed it out as inactive?

A.      Yes.

Q.      And
did you do that?

A.      No.

In contending that his trial
counsel’s failure to object amounted to constitutional error, Herrera again
relies on Fuller, in which the court of appeals condemned the following
testimony elicited from the police investigator:

Q.      Did you make a determination whether [the
complainant] was credible prior to filing the arrest warrant?

A.
     I did.

Q.
     Did you find her credible?

A.
     Yes, sir.

The Fuller court concluded
that this testimony was prohibited because the State directly elicited its
expert’s opinion concerning the complainant’s credibility.  Fuller, 228
S.W.3d at 835.  The testimony in this case falls on the other side of the fine
line.  In contrast to the prohibited line of inquiry in Fuller, the
State’s questions appear aimed to rebut the impression created by defense
counsel’s cross-examination that S.S. had changed details in his report not
because they were truthful, but to conform to those reported by other witnesses,
and to address defense counsel’s elicitation of the witness’s opinion that
“allegations like this” can “turn out to be false.”  Further, in its direct,
the State in this case focused carefully on the procedural aspects of the
detective’s investigation and did not ask her opinion concerning the
credibility of the complainant.  We hold that the absence of an objection by
Herrera’s trial counsel does not show that his representation fell below an
objective standard of reasonableness.  See Strickland, 466 U.S. at 688, 104 S. Ct. at 2065.  

Conclusion

Herrera has not borne his
burden to rebut the presumption that trial counsel made all significant
decisions in the exercise of reasonable professional judgment.  We therefore
affirm the judgment of the trial court.

 

 

                                                          Jane Bland

                                                          Justice

Panel consists of
Justices Keyes, Hanks, and Bland.

Do not publish.  Tex. R. App. P. 47.2(b).

 

 

 

 









[1]
Herrera does not complain about his counsel’s
strategy in cross-examination.